UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Northwest Airlines, Inc.,

    Plaintiff/Counterdefendant,

and

Air Line Pilots Association,

    Intervenor-Plaintiff/Counterdefendant,

v.                                                    Civil No. 07-4803 (JNE/JJG)
                                                    ORDER

Raymond B. Phillips, Michael Tanksley,
Belmont Beck, Platt Hubbell, Timothy I.
Meldahl, Gregory S. Novotny, William J.
Riley, and Ralph C. Taylor, Individually,
and as Representatives of Persons
Similarly Situated,

    Defendants/Counterclaimants.

---

Thomas W. Tinkham, Esq., Stephen P. Lucke, Esq., and Andrew J. Holly, Esq., Dorsey & Whitney LLP, appeared for Plaintiff and Counterdefendant Northwest Airlines, Inc.

Richard M. Seltzer, Esq., Thomas N. Ciantra, Esq., and Evan Hudson-Plush, Esq., Cohen, Weiss and Simon LLP, appeared for Intervenor-Plaintiff and Counterdefendant Air Line Pilots Association.

Jeffrey Lewis, Esq., and Nina Wasow, Esq., Lewis, Feinberg, Lee, Renaker & Jackson, P.C., and Lawrence P. Schaefer, Esq., Schaefer Law Firm, LLC, appeared for Defendants and Counterclaimants Raymond B. Phillips, Michael Tanksley, Belmont Beck, Platt Hubbell, Timothy I. Meldahl, Gregory S. Novotny, William J. Riley, and Ralph C. Taylor, Individually, and as Representatives of Persons Similarly Situated.

---

      Northwest Airlines, Inc. (Northwest), and the Air Line Pilots Association (ALPA) seek a declaratory judgment against a defendant class of pilots (Pilots) that Northwest's Money Purchase Plan for Pilot Employees (MP3) complies with section 204(b) of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (2000).  The Pilots bring

1

counterclaims alleging that the MP3 violates ERISA, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634 (2000), and California, Minnesota, and Washington laws prohibiting age discrimination. The Pilots also claim ALPA breached its duty of fair representation by negotiating and enforcing the MP3. The case is before the Court on Northwest's and ALPA's motions for judgment on the pleadings and for summary judgment. Northwest and ALPA contend that the MP3 does not violate ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B); that ADEA § 4(i)(4) precludes the Pilots' claims under ADEA § 4(a), (c)[1]; that if ADEA § 4(i)(4) does not preclude the Pilots' claims under ADEA § 4(a), (c), the MP3 does not violate ADEA § 4(a), (c); and that ERISA preempts the Pilots' state-law claims. ALPA also contends that it did not breach its duty of fair representation. The Pilots moved for a continuance as to whether the MP3 violates ADEA § 4(a), (c) and whether ALPA breached its duty of fair representation, and the Court granted the continuance. For the reasons set forth below, the Court grants the non-continued portions of Northwest's and ALPA's motions.

## I.   BACKGROUND

Before declaring bankruptcy on September 14, 2005, Northwest provided retirement benefits to its pilots through the Northwest Airlines Pension Plan for Pilot Employees (Pension Plan), which was a defined benefit plan established and maintained under ERISA.[2] Under the Pension Plan, participants received retirement benefits in the form of a monthly annuity. The

---

[1]   ADEA § 4(a) applies to employers such as Northwest, while ADEA § 4(c) applies to labor organizations such as ALPA. *See* 29 U.S.C. § 623(a) ("It shall be unlawful for an employer"); *id.* § 623(c) ("It shall be unlawful for a labor organization"). Although the Pilots do not refer to ADEA § 4(c) in their motion papers, the Court references the Pilots' claims under both subsections.

[2]   In a defined benefit plan, the employer bears the risk of investment performance because the benefit is generally guaranteed regardless of how the market performs. *See Hirt v. Equitable Ret. Plan for Employees, Managers, & Agents*, 533 F.3d 102, 104-05 (2d Cir. 2008).

amount of the annuity was based on the participant's years of service and final average earnings. For example, a pilot who worked 25 years or more at Northwest and retired at age 60 would receive a monthly income equal to 60% of the pilot's final average earnings. In addition, pilots could contribute to a defined contribution plan, the Retirement Savings Plan (RSP).[3]

After Northwest declared bankruptcy, Northwest and ALPA sought passage of the Pension Protection Act of 2006 (PPA), which permitted Northwest to spread its funding payments for the Pension Plan over an additional number of years. *See* Pension Protection Act of 2006, Pub. L. No. 109-280, § 402, 120 Stat. 780 (codified in scattered sections of 26 and 29 U.S.C.). Northwest and ALPA agreed that if the PPA passed, they would "freeze" the Pension Plan as of January 31, 2006. Northwest and ALPA maintain that passage of the PPA prevented termination of the Pension Plan and a consequent reduction in pilots' retirement benefits similar to that experienced by pilots at U.S. Airways and United Airlines after those airlines declared bankruptcy. The PPA passed, and Northwest and ALPA froze the Pension Plan, fixing each pilot's pension benefit at a monthly amount as of January 31, 2006. No future service or earnings after January 31, 2006, is used to calculate benefits under the Pension Plan.

Northwest and ALPA then negotiated new retirement benefits for the pilots. Pursuant to a letter agreement executed in July 2006, they agreed that Northwest would contribute 5% of pilot earnings to the RSP in 2007, 6% in 2008, 6.5% in 2009, 7% in 2010, and 8% in 2011 and subsequent years. Under the letter agreement, each pilot would receive an individual contribution to his account proportional to his pay (pro-rata to pay). For example, each pilot received a contribution equal to 5% of his pay in 2007. The letter agreement provided, however,

---

[3] In a defined contribution plan, each employee has an individual account and receives a benefit based on the amount contributed to the account and any income, expenses, gains, and losses. *See Hirt*, 533 F.3d at 104-05. The employee bears the investment risk. *See id.* at 105.

3

that "[ALPA] shall have the right to determine an alternate method for allocating the [Northwest] contribution to Participants' [RSP accounts] subject to [Northwest's] agreement that it is legal, complies with applicable regulations, and is administratively feasible."

ALPA predicted that the combination of the pro-rata to pay plan and the frozen Pension Plan benefit would have resulted in the retirement benefits received by active pilots ranging between 30% and 75% of their final average earnings. Senior pilots who had already accrued approximately 60% of their final average earnings as a frozen Pension Plan benefit would receive RSP contributions that would result in a combined retirement benefit of over 60%, while less senior pilots who had not accrued close to 60% of their final average earnings would never be able to reach 60% even with Northwest's contributions to their RSP accounts.[4] To address this disparity, ALPA proposed that Northwest allocate its contributions to the RSP using a "targeting" methodology. Northwest agreed, and Northwest and ALPA executed a letter agreement implementing the challenged MP3 as a "target benefit plan" on December 11, 2007.[5]

The MP3, which became effective on January 1, 2008, targets approximately 50% of a pilot's projected final average earnings as retirement income according to the following methodology.[6] First, a "stovepipe" model made a one-time calculation of each active pilot's projected final average earnings. The stovepipe model generated a hypothetical career for each pilot based on his seniority, years of service, age, and flight/seat position as of December 31,

---

[4]   A post-bankruptcy reduction in pilots' salaries contributed to the disparity.

[5]   A target benefit plan is a type of defined contribution plan designed to emulate a defined benefit plan in that employer contributions are actuarially determined as those necessary to achieve a targeted benefit for the employee based on various reasonable assumptions. Dan M. McGill et al., Fundamentals of Private Pensions 283 (8th ed. 2005).

[6]   Northwest's contributions to the RSP are insufficient to achieve a target of 60%.

4

2007. It assumed a static Northwest fleet, that all pilots retire at age 60,[7] that openings in the fleet would be created by normal retirements and by the promotion of other pilots resulting from those retirements, that openings would be filled solely on the basis of seniority, and that pilots' pay would increase 1.5% annually for the years 2008 to 2010 and 2% annually after 2010. The stovepipe model calculated projected final average earnings as the average monthly compensation of the highest 60 months of earnings of the last 120 months prior to retirement based on the pilot's hypothetical career. It does not take into account any deviation between its projections and a pilot's actual experience after the effective date of the MP3.

Next, each pilot's "target percentage" is determined based on the pilot's age and number of "points." The target percentage is the percentage of a pilot's projected final average earnings the MP3 is designed to provide as a retirement benefit. Each pilot's points are calculated as the sum of his age and years of service under the Pension Plan as of December 31, 2007. The greater the points, the higher the target percentage, which means that an older pilot having the same years of service as a younger pilot has a higher target percentage than the younger pilot. For example, a pilot under the age of 50 on December 31, 2007, and having fewer than 50 points has a target percentage of 19%, a pilot under the age of 50 the same date and having 65 or more points has a target percentage of 43%, and a pilot aged 50 or over on the same date and having 65 or more points has a target percentage of 46%.

The target percentage is used to calculate each pilot's "gross target benefit," expressed as

---

[7]   When the MP3 became effective, the Federal Aviation Administration (FAA) imposed a mandatory retirement age of 60 for pilots. On December 13, 2007, two days after adoption of the MP3, Congress extended the mandatory retirement age for pilots from 60 to 65. 49 U.S.C.A. § 44729(a) (West Supp. 2008). Congress expressly prohibited suits based on acts taken in conformance with the FAA limitation of 60 prior to passage of that section. *See id.* § 44729(e)(2).

5

a monthly lifetime payment beginning at age 60, by multiplying his projected final average earnings by the target percentage and a projected service ratio. The projected service ratio equals a pilot's projected years of service at age 60 divided by 25. Projected years of service are calculated as the sum of the pilot's years of service on January 1, 2008, and the number of years between January 1, 2008, and the date the pilot will turn 60. A pilot projected to have 15 years of service at age 60 has a projected service ratio of 0.6. A pilot projected to have 25 years of service at age 60 has a projected service ratio of 1. Because Northwest limits the number of years of service taken into account for the projected service ratio to 25, a pilot projected to have 30 years of service at age 60 also has a projected service ratio of 1.[8]

The pilot's frozen Pension Plan benefit is then subtracted from the gross target benefit to obtain the "net target benefit," also expressed as a monthly lifetime payment beginning at age 60. A pilot whose frozen Pension Plan benefit exceeds his gross target benefit will receive no contributions under the MP3. Instead, the pilot will receive his frozen Pension Plan benefit as retirement income. The named defendants/counterclaimants fall into this category. A pilot whose gross target benefit exceeds his frozen Pension Plan benefit will receive contributions under the MP3. In some cases, however, these contributions will be lower than what the pilot would have received under the pro-rata to pay plan. For the pilots who receive contributions under the MP3, the net target benefit is converted to a lump sum value determined as of the date the pilot will turn 60. This lump sum value is an estimate of the amount required to fund the pilot's net target benefit. The target contribution received by the pilot is a semi-monthly contribution made until the earlier of the completion of 25 years of service or age 60, which,

---

[8] ADEA permits a plan to limit, without regard to age, the years of service taken into account for purposes of determining benefit accrual under the plan. *See* 29 U.S.C. § 623(i)(2).

together with an assumed investment return of 8%, will achieve the lump sum value.[9]

For purposes of the Pilots' ERISA and duty of fair representation claims, the named defendants/counterclaimants represent a class of Northwest pilots who are participants in the MP3, are age 40 and over, and who receive no contributions under the MP3 or smaller contributions to their MP3 accounts than under the pro-rata to pay plan.[10] For purposes of the ADEA claims, they represent collective action members who are Northwest pilots, participants in the MP3, are age 40 or over, and receive no contributions under the MP3 or smaller contributions to their MP3 accounts than under the pro-rata to pay plan. Of the 4399 pilots participating in the MP3, almost half will receive no contributions under the MP3 because their frozen Pension Plan benefit exceeds their gross target benefit, and some will receive a smaller contribution under the MP3 than their contribution under the pro-rata to pay plan.

## II.   DISCUSSION

All parties presented matters outside the pleadings in support of their respective positions. The Court therefore treats Northwest's and ALPA's motions as motions for summary judgment. *See* Fed. R. Civ. P. 12(d).

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify

---

[9]   According to a joint collective bargaining agreement negotiated as a result of the merger between Northwest and Delta Air Lines, the MP3 terminates at the end of 2013 and will be replaced by pro-rata to pay contributions of 14% in 2014. Under the terms of the agreement, Northwest will contribute to the RSP an additional 1% in 2010, 2% in 2011, 3% in 2012, and 6% in 2013, to be allocated on a pro-rata to pay basis.

[10]   Minnesota, California, and Washington subclasses exist for pilots who reside in one of those three states.

"those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the nonmovant must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      Claims under ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B)**

The Pilots claim that the MP3 violates provisions in ADEA and ERISA prohibiting the cessation of allocations or reduction of the rate of allocations to an employee's defined contribution account because of age. ADEA § 4(i)(1)(B) proscribes "the cessation of allocations to an employee's account, or the reduction of the rate at which amounts are allocated to an employee's account, because of age," 29 U.S.C. § 623(i)(1)(B), and ERISA § 204(b)(2)(A) provides that a "plan satisfies the requirements of [ERISA 204(b)(2)] if, under the plan, allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age," *id.* § 1054(b)(2)(A). Congress intended these subsections "to be interpreted in a consistent manner." *See* H.R. Rep. No. 99-1012, at 378-79 (1986) (Conf. Rep.), *as reprinted in* 1986 U.S.C.C.A.N. 3868, 4023-24. Consequently, if the MP3 violates ERISA § 204(b)(2)(A), it violates ADEA § 4(i)(1)(B), and if the MP3 does not violate ERISA § 204(b)(2)(A), it does not violate ADEA § 4(i)(1)(B). *See Hurlic v. S. Cal. Gas Go.*, 539 F.3d 1024, 1036 (9th Cir. 2008).

As originally enacted, ERISA permitted employers to stop benefit accruals or allocations to an employee's account if the employee worked beyond the normal retirement age under the

8

plan. *See* H.R. Rep. 99-1012, at 378, *as reprinted in* 1986 U.S.C.C.A.N. 3868, 4023. Congress enacted ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B) as part of the 1986 Omnibus Budget Reconciliation Act (OBRA), 99 Pub. L. 509, 100 Stat. 1874, to prevent employers from reducing or discontinuing allocations to an employee's account "on account of the attainment of a specified age" and "to require a plan to provide for benefit accruals and contributions with respect to an employee's years of plan participation after normal retirement age."[11] *See* H.R. Rep. No. 99-1012, at 376, 378, *as reprinted in* 1986 U.S.C.C.A.N. 3868, 4021, 4023.

Courts analyze challenges made under OBRA based on the structure and terms of the challenged plan. *See, e.g.*, *Hurlic*, 539 F.3d at 1029-32; *Hirt v. Equitable Ret. Plan for Employees, Managers, & Agents*, 533 F.3d 102, 107-10 (2d Cir. 2008); *Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56, 67-70 (3d Cir. 2007); *Cooper v. IBM Pers. Pension Plan*, 457 F.3d 636, 637-42 (7th Cir. 2006); *Atkins v. Nw. Airlines, Inc.*, 967 F.2d 1197, 1199-1202 (8th Cir. 1992). Here, the parties directed their arguments to the structure and terms of the MP3 and stovepipe model. The Court therefore considers the Pilots' challenge under ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B) based on the structure and terms of the MP3, including the stovepipe model, and does not consider disparate treatment or disparate impact in the context of those claims. *See Vaughn v. Air Line Pilots Ass'n, Int'l*, 395 B.R. 520, 541 n.14 (E.D.N.Y. 2008) (disparate impact and discriminatory treatment claims cannot be asserted under ADEA § 4(i)); *Eaton v. Onan Corp.*, 117 F. Supp. 2d 812, 823 (S.D. Ind. 2000) (whether ERISA § 204(b) and ADEA § 4(i) "are violated does not depend on any question of intent").

---

[11]   ADEA and ERISA contain parallel subsections directed to defined benefit plans. *See* 29 U.S.C. §§ 623(i)(1)(A), 1054(b)(1)(H)(i); *see also Cooper v. IBM Pers. Pension Plan*, 457 F.3d 636, 638 (7th Cir. 2006) (describing ERISA § 204(b)(1)(H)(i), (b)(2)(A) as parallel provisions).

9

The Pilots do not allege that the MP3, on its face, discontinues or reduces allocations when a pilot works beyond the age of 60.[12]  Rather, they base their challenge to the MP3 on its use of the stovepipe model to predict each pilot's final average earnings.  Specifically, the Pilots claim the stovepipe model's use of age to calculate remaining years of service, its subsequent use of remaining years of service to project final average earnings, and the MP3's reliance on the projected final average earnings figure violate ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B).

The stovepipe model used age to calculate remaining years of service by subtracting the pilot's age on December 31, 2007, from the then-mandatory retirement age of 60.[13]  It then used remaining years of service in conjunction with the pilot's flight/seat position and seniority as of December 31, 2007, to predict whether he would be promoted to higher-paying positions before his assumed retirement at age 60.  The stovepipe model also used each pilot's remaining years of service when determining the number and amount of annual pay increases and cost of living adjustments the pilot would receive before age 60.  In other words, the stovepipe model took into account the effect of a federally-mandated retirement age on opportunities for promotions and to receive cost of living adjustments and annual pay increases when projecting a pilot's final average earnings.

---

[12]   The MP3 provides that for a pilot who continues working after 60, the net target benefit will be re-determined on the January 1 following the pilot's normal retirement date at age 60 and each January 1 thereafter by increasing the numerator in the pilot's service ratio to include projected benefit service that could be earned by the end of the calendar year including the re-determination date, subject to the restriction that the numerator will not exceed 25.  The pilot's projected final average earnings will remain unchanged.

[13]   A plan may provide for a normal retirement age without violating ADEA § 4(i)(1)(B). *See* 29 U.S.C. § 623(i)(8) ("A plan shall not be treated as failing to meet the requirements of this section solely because such plan provides a normal retirement age . . .").

As explained by several circuit courts of appeals when rejecting age discrimination challenges to "cash balance" pension plans,[14] nothing in the language or legislative history of OBRA suggests that "Congress set out to legislate against the fact that younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings." *See, e.g.*, *Hurlic*, 539 F.3d at 1031; *Register*, 477 F.3d at 66; *Cooper*, 457 F.3d at 639. The Pilots seek to distinguish the cash balance cases because all participants in a cash balance plan receive the same allocations to their accounts, whereas all MP3 participants do not receive the same allocations.[15] Despite this difference, the Court finds an underlying principle of the cash balance cases—that Congress did not intend age discrimination under OBRA to include disparities resulting from the passage of time—equally applicable to the Pilots' challenge to the MP3. Treating a younger pilot's increased earning potential resulting from his greater remaining years of service as a form of age discrimination is not sensible. *Cf. Cooper*, 457 F.3d at 639; *U.S. Equal Employment Opportunity Comm'n v. Baltimore County*, __ F. Supp. 2d __, Civil No. L-07-2500, 2009 WL 139582, at *3 (D. Md. Jan. 21, 2009) ("Baltimore County's requirement that older new-hires pay higher contribution rates is based on the number of years a new-hire has until reaching normal retirement age and how long

---

[14] A cash balance plan is a defined benefit plan where "pay credits," usually expressed as a percentage of compensation, and "interest credits," which are hypothetical earnings, are deposited in a participant's hypothetical account. *Drutis v. Rand McNally & Co.*, 499 F.3d 608, 613 (6th Cir. 2007). A participant receives the right to future interest credits projected out to normal retirement age when she receives a pay credit for a year of service. *Id.* In a cash balance plan, the projected interest credits are larger for younger employees, who "necessarily have a longer period of time before they reach age 65." *Id.*

[15] The Pilots also seek to distinguish the cases on the ground that they involve defined benefit rather than defined contribution plans. This distinction is not persuasive because, as explained by the Seventh Circuit in *Cooper*, the ERISA subsections governing defined benefit and defined contribution plans "provide similar treatment with respect to claims of age discrimination." 457 F.3d at 641.

11

it will take to accumulate a sufficient reserve to fund the new-hire's life annuity. This is an economic—not age-based—consideration. It is of no legal consequence, therefore, that the ERS's member contribution rates are correlated with age.").

Counsel for the Pilots at the hearing conceded that he could not think of a way for employers to accurately project final average earnings without considering age. Counsel suggested that employers avoid using age by "just set[ting] a number" for either projected final average earnings or a desired monthly annuity. Nothing in OBRA's language or legislative history suggests that Congress intended OBRA—which was enacted to ensure that employees received benefit accruals and contributions for employment after normal retirement age—to limit employers to arbitrarily-selected targets or to prohibit employers from using projected future average earnings as a target. *See Atkins*, 967 F.2d at 1199 (Congress enacted OBRA "to require employers to credit employees on their pensions for employment that continued after normal retirement age"); H.R. Rep. No. 99-1012, at 376, *as reprinted in* 1986 U.S.C.C.A.N. 3868, 4021 (OBRA requires a plan to "provide for benefit accruals and contributions with respect to an employee's years of plan participation after normal retirement age."). The stovepipe model's use of age to project final average earnings and the MP3's reliance on that figure do not implicate the policies behind the enactment of OBRA. The stovepipe model's incorporation of a federally-mandated retirement age into its projection of final average earnings does not constitute age discrimination under ADEA § 4(i)(1)(B) and ERISA § 204(b)(2)(A).

Moreover, showing age discrimination under ADEA § 4(i)(1)(B) and ERISA § 204(b)(2)(A) requires more than showing that allocations differ among employees. The Pilots must show that the allocations are ceased or reduced "because of" age. *See* 29 U.S.C. §§ 623(i)(1)(B), 1054(b)(2)(A). On its face, the MP3 does not use age when calculating

allocations. The Court therefore turns to whether the MP3's use of projected final average earnings, which incorporates a pilot's age, equates to cessation or reduction of allocations "because of" age.

The Pilots offer the declarations of Ian Altman, an actuarial consultant, and Dr. Richard Drogin, a professor in statistics, in support of their argument that the stovepipe model's use of age violates ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B). These declarations do not aid the Court because they do little more than show a negative correlation between age and allocations under the MP3.[16] *See Cooper*, 457 F.3d at 642 (explaining that "it is essential to separate age *discrimination* from other characteristics that may be correlated with age . . . a plaintiff alleging age discrimination must demonstrate that the complained-of effect is *actually* on account of age") (citations omitted)). Although the Pilots base their challenge on the effect age has on projected final average earnings, they provide no data or information as to the actual effect of age, isolated from other variables, on projected final average earnings or on allocations under the MP3.

An understanding of the effect of age on projected final average earnings, and therefore MP3 allocations, is essential to the Court's analysis because it is not age discrimination to base allocations on a factor that is analytically distinct from, yet correlated with, age. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993); *Hurlic*, 539 F.3d at 1031 (no age discrimination under ERISA § 204(b)(1)(H)(i) when difference in total accrued benefit resulted from time value of money, which was analytically distinct from age); *Cooper*, 457 F.3d at 639 (same); *EEOC v.*

---

[16] The Court disregards Altman's conclusion that the stovepipe model's projection of final average earnings based on a pilot's remaining years of service "directly translates into providing allocations that reduce or cease because of age" because Altman does not explain why the negative correlation between age and allocations under the MP3 requires this conclusion, show the *effect* of age on allocations, or account for the effect of other variables such as projected service ratio. *See Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993).

13

*McDonnell Douglas Corp.*, 191 F.3d 948, 951 (8th Cir. 1999) (holding that "employment decisions motivated by factors other than age (such as retirement eligibility, salary, or seniority), even when such factors correlate with age, do not constitute age discrimination"). If projected final average earnings is analytically distinct from age, Northwest may base allocations under the MP3 on projected final average earnings without running afoul of ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B).

A variable may be analytically distinct from age even though it depends in part on age. *See Ky. Ret. Sys. v. EEOC*, 128 S. Ct. 2361, 2367 (2008). As explained in *Kentucky Retirement*, age and pension status are analytically distinct because:

> one can easily conceive of decisions that are actually made "because of" pension status and not age, even where pension status is itself based on age. Suppose, for example that an employer pays all retired workers a pension, retirement eligibility turns on age, say 65, and a 70-year-old worker retires. Nothing in language or in logic prevents one from concluding that the employer has begun to pay the worker a pension, not because the worker is over 65, but simply because the worker has retired.

128 S. Ct. at 2367. Here, a pilot's allocation under the MP3 depends on his projected service ratio, his frozen Pension Plan benefit, his points, and the amount of his projected final average earnings, which is a function of his age, seniority, and flight/seat position as of December 31, 2007. Nothing prevents one from concluding that a pilot receives allocations under the MP3 not because he is younger, but simply because he held a high-paying flight/seat position as of December 31, 2007, or because his projected service ratio is 1 rather than 0.6.[17] Projected final average earnings and age are analytically distinct.

---

[17] The Court notes that the MP3 uses projected remaining years of service, which is based in part on age, to calculate each pilot's projected service ratio. The Pilots do not challenge the MP3's use of an age-based projected service ratio, which is directly related to the gross target benefit, nor do they explain why using age when calculating projected final average earnings violates ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B) when the use of age to calculate a projected service ratio does not.

The analytical distinction between projected final average earnings and age is illustrated by the fact that some older pilots have higher projected final average earnings than younger pilots. For example, the stovepipe model projected final average earnings of $241,414 for one named defendant who was 56 years old on January 1, 2008, and of $178,385 for another named defendant who was 52 years old on that date.[18] Because projected final average earnings and age are analytically distinct, Northwest may base MP3 allocations on projected final average earnings without violating ERISA § 204(b)(2)(A) or ADEA § 4(i)(1)(B). *See Hazen Paper*, 507 U.S. at 611; *Hurlic*, 539 F.3d at 1031; *Cooper*, 457 F.3d at 639; *McDonnell Douglas*, 191 F.3d at 951.

Finally, the Court addresses three additional claims made in the Altman declaration. According to Altman, adjusting the projected final average earnings figure to reflect actual earnings and to factor in pay increases occurring after the age of 60 would benefit older pilots most because it could convert them from receiving no contributions to receiving contributions under the MP3. Altman also claims that making MP3 allocations as a level percent of pay rather than a level dollar amount would cause a substantially greater percentage of the total Northwest contribution to go to older pilots. The Pilots do not explain how these features of the MP3 and stovepipe model amount to reducing or ceasing allocations "because of the attainment of any age," and the Court concludes that these features do not violate ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B). For these reasons, the Court grants Northwest and ALPA summary judgment that the MP3 does not violate ADEA § 4(i)(1)(B) or ERISA § 204(b)(2)(A).

---

[18] Both pilots had a projected service ratio of 1.

15

**B.      Claims under ADEA § 4(a), (c)**

Northwest and ALPA argue that the Pilots may not bring claims under ADEA § 4(a), (c) because the MP3 does not violate ADEA § 4(i). The Pilots contend that this argument is in tension with the Supreme Court's decisions in *Smith v. City of Jackson*, 544 U.S. 228 (2005), and *Kentucky Retirement Systems v. EEOC*, 128 S. Ct. 2361 (2008). Having concluded that the MP3 does not violate ADEA § 4(i)(1)(B), the Court turns to whether the Pilots may bring claims under ADEA § 4(a), (c).

ADEA § 4(i)(4) states "[c]ompliance with the requirements of this subsection with respect to an employee pension benefit plan shall constitute compliance with the requirements of this section relating to benefit accrual under such plan." The Court's "objective in interpreting a federal statute is to give effect to the intent of Congress." *United States v. McAllister*, 225 F.3d 982, 986 (8th Cir. 2000) (quotation marks omitted). "If the plain language of the statute is unambiguous, that language is conclusive absent clear legislative intent to the contrary. Therefore, if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *Id.* (quoting *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir. 1997)). The statutory language is unambiguous—an employee pension benefit plan that complies with ADEA § 4(i) complies with the requirements of ADEA § 4 with respect to benefit accrual. The Pilots do not dispute that their challenge is directed to benefit accrual or to an employee pension benefit plan, nor have they challenged the MP3 under any portion of ADEA § 4(i) other than ADEA § 4(i)(1)(B). ADEA § 4(i)(4) dictates that the MP3's compliance with ADEA § 4(i)(1)(B) constitutes compliance with ADEA § 4(a), (c).

The legislative history of ADEA § 4(i) supports the conclusion that ADEA § 4(i)(4) precludes the Pilots' claims under ADEA § 4(a), (c). According to the Conference Report, "[i]t

16

is the intention of the conferees [in adopting § 4(i)] that the requirements contained in section 4(i) related to an employee's rights to benefit accruals with respect to an employee benefit plan . . . shall constitute the entire extent to which ADEA affects such benefit accrual and contribution matters with respect to such plans." H.R. Rep. No. 99-1012, at 382, *as reprinted in* 1986 U.S.C.C.A.N. 3868, 4027. Therefore, the legislative history confirms that a plaintiff may not proceed under ADEA § 4(a), (c) if the challenged plan satisfies ADEA § 4(i).

The Supreme Court's decisions in *Smith* and *Kentucky Retirement* do not require a different conclusion. In *Smith*, the Supreme Court held that disparate impact claims were cognizable under ADEA § 4(a). *See* 544 U.S. at 232. The Pilots contend that interpreting ADEA § 4(i)(4) to preclude claims under ADEA § 4(a) would significantly limit *Smith* because a plan that does not violate ADEA § 4(i) has a "free pass" from claims of age discrimination related to benefit accruals. The Pilots further contend that the Supreme Court's analysis of a challenge to a disability benefit plan under ADEA § 4(a) in *Kentucky Retirement*, 128 S. Ct. at 2364, was an implicit recognition that claims of discriminatory pension accruals could proceed under ADEA § 4(a). There is no indication that ADEA § 4(i)(4) was raised in *Smith* or *Kentucky Retirement*, and the Supreme Court did not address the effect of this subsection on claims under ADEA § 4(a), (c) in either opinion. The Court therefore declines to draw any conclusion as to the effect of ADEA § 4(i)(4) on claims under ADEA § 4(a), (c) from these decisions. Moreover, while precluding challenges to a plan under ADEA § 4(a), (c) if the plan complies with ADEA § 4(i) may significantly limit *Smith*, this result follows from the unambiguous language of ADEA § 4(i)(4).

Several other cases cited by the Pilots either do not discuss ADEA § 4(i)(4), *see Jankovitz v. Des Moines Independent Community School District*, 421 F.3d 649 (8th Cir. 2005); *Arnett v.*

*California Public Employees Retirement System (PERS)*, 179 F.3d 690 (9th Cir. 1999), or support the conclusion that compliance with the requirements of ADEA § 4(i) precludes claims under ADEA § 4(a), (c), *see Engers v. AT&T*, No. Civ. A. 98-3660, 2007 WL 958472, at *2 (D.N.J. Mar. 29, 2007) ("The meaning of § 4(i) is plain and unambiguous: if a plan complies with § 4(i), it complies with all benefit accrual requirements in § 4."). Although the court in *George v. Duke Energy Retirement Cash Balance Plan* permitted the plaintiffs to proceed with a disparate impact claim under ADEA § 4(a) after dismissing a claim under ADEA § 4(i)(A)(1) over the defendant's objection that ADEA § 4(i) is the sole ground for challenging allegedly discriminatory benefit accruals under the ADEA, the court did not discuss the language of ADEA § 4(i)(4). *See* 560 F. Supp. 2d 444, 463-64 (D.S.C. 2008). The Court therefore finds *George* unpersuasive.

In contrast, the Ninth Circuit's discussion of ADEA § 4(i)(4) in *Hurlic* is helpful. The Ninth Circuit affirmed the dismissal of a claim under the ERISA provision prohibiting, for defined benefit plans, the cessation of benefit accrual or reduction of the rate of benefit accrual because of the attainment of any age. *Hurlic*, 539 F.3d at 1029-32. The court of appeals then found that ERISA preempted the plaintiffs' age discrimination claims under state law. *Id.* at 1035-37. In doing so, the Ninth Circuit interpreted ADEA § 4(i)(4) to mean that a pension plan provision relating to benefit accrual "need satisfy only the requirements of ADEA § 4(i)." *Id.* at 1036-37. The Pilots contend that *Hurlic* is in error because it did not discuss *Smith*, but as previously explained, nothing in *Smith* suggests that ADEA § 4(i)(4) does not mean what it says—that a plan that complies with ADEA § 4(i) complies with the entirety of ADEA § 4. Consequently, the Court finds the discussion of ADEA § 4(i)(4) in *Hurlic* persuasive as to its effect on the Pilots' claims under ADEA § 4(a), (c).

18

The Pilots argue that it is doubtful that Congress intended ADEA § 4(i)(4) to deprive employees of an opportunity to challenge pension plans that were adopted due to discriminatory animus. The Pilots did not give any examples of a pension plan adopted due to discriminatory animus that could pass the strictures of ADEA § 4(i), and the Court is not persuaded that such a plan—a plan in which discriminatory animus is made manifest—is possible. This argument therefore carries little weight. Regardless of whether such a pension plan is possible, the Court cannot disregard the clear language of ADEA § 4(i)(4) stating that compliance with ADEA § 4(i) constitutes compliance with all of ADEA § 4. Therefore, the Court grants summary judgment to Northwest and ALPA on the Pilots' claims under ADEA § 4(a), (c).[19]

## C. State Law Claims

Northwest and ALPA contend that ERISA preempts the Pilots' state-law age discrimination claims. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" regulated by ERISA. 29 U.S.C. § 1144(a). State laws that prohibit employment practices that are lawful under ADEA are preempted by ERISA. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 102-03 (1983). The Pilots concede that if ADEA § 4(i)(4) precludes their claims under ADEA § 4(a), (c), ERISA preempts their state-law age discrimination under the principles set forth in *Shaw*. The Court has concluded that compliance with ADEA § 4(i) precludes the Pilots' claims under ADEA § 4(a), (c). The Court therefore concludes that ERISA preempts the Pilots' state-law age discrimination claims, and grants

---

[19] Northwest and ALPA contend, as the *Engers* defendants did, that ADEA § 4(i) "exclusively governs" any claim of age discrimination in benefit accrual or allocations under a pension plan. The question before the Court is whether the MP3's compliance with ADEA § 4(i) precludes the Pilots' claims under ADEA § 4(a), (c), not whether ADEA § 4(i) is an exclusive remedy for age discrimination challenges to benefit accrual or allocations under a pension plan. The Court therefore declines to decide whether ADEA § 4(i) provides the exclusive remedy for such challenges.

19

Northwest and ALPA summary judgment on the Pilots' claims under Minnesota, California, and Washington law.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Northwest's motion for summary judgment [Docket No. 133] is GRANTED IN PART.

2. ALPA's motion for summary judgment [Docket No. 140] is GRANTED IN PART.

3. Counts II-VI of Defendants' Amended Counterclaim [Docket No. 110] are DISMISSED WITH PREJUDICE.

Dated: January 26, 2009

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge