UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Northwest Airlines, Inc.,

        Plaintiff/Counterdefendant,

and

Air Line Pilots Association,

        Intervenor-Plaintiff/Counterdefendant,

v.                                               Civil No. 07-4803 (JNE/JJG)
                                              ORDER

Raymond B. Phillips, Michael Tanksley,
Belmont Beck, Platt Hubbell, Timothy I.
Meldahl, Gregory S. Novotny, William J.
Riley, and Ralph C. Taylor, Individually,
and as Representatives of Persons Similarly Situated,

        Defendants/Counterclaimants.

---

Marnie L. DeWall, Esq., and Amy R. Mason, Esq., Lindquist & Vennum, P.L.L.P., and Richard M. Seltzer, Esq., Thomas N. Ciantra, Esq., and Evan Hudson-Plush, Esq., Cohen, Weiss and Simon LLP, appeared on brief for Intervenor-Plaintiff/Counterdefendant Air Line Pilots Association.

Jeffrey Lewis, Esq., Margo Hasselman, Esq., and Nina Wasow, Esq., Lewis, Feinberg, Lee, Renaker & Jackson, P.C., Lawrence P. Schaefer, Esq., Schaefer Law Firm, LLC, and Seymour Mansfield, Esq., and Denise Y. Tataryn, Esq., Mansfield, Tanick & Cohen, P.A., appeared on brief for Defendants/Counterclaimants Raymond B. Phillips, Michael Tanksley, Belmont Beck, Platt Hubbell, Timothy I. Meldahl, Gregory S. Novotny, William J. Riley, and Ralph C. Taylor, Individually, and as Representatives of Persons Similarly Situated.

Northwest Airlines, Inc., did not appear.

---

        This case is before the Court on the motion of the Air Line Pilots Association (ALPA) for summary judgment on the sole remaining counterclaim of a class of pilots (Pilots) for breach of

the duty of fair representation (DFR). For the reasons set forth below, the Court grants ALPA's motion.

## I. BACKGROUND

On January 26, 2009, the Court granted partial summary judgment for Northwest Airlines, Inc. (Northwest), and ALPA. The Court concluded that the Money Purchase Plan for Pilot Employees (MP3), a target benefit plan, did not violate either the Age Discrimination in Employment Act or the Employee Retirement Income Security Act (ERISA), and that ERISA preempted the Pilots' state-law claims. On May 7, 2009, the Court granted ALPA's motion for judgment on the pleadings as to the Pilots' DFR claims based on arbitrary or bad faith conduct. The sole remaining claim is the Pilots' claim that ALPA's decision to adopt the MP3 was made out of discriminatory animus toward the "older and more senior pilots" in violation of the DFR.[1] Having detailed the facts of this case in orders dated January 26, 2009, and May 7, 2009, the Court reviews them briefly here.

In the wake of September 11, 2001, Northwest, like the entire airline industry, faced tremendous financial difficulty. On September 14, 2005, confronted with increasing losses, Northwest filed for bankruptcy. Northwest and ALPA agreed to freeze the Northwest Airlines Pension Plan for Pilot Employees and agreed that, going forward, Northwest would contribute a percentage of pilot earnings annually to a Retirement Savings Plan. Under the agreement, each pilot would receive benefits based on his pay, but ALPA had the right to determine an alternative method of allocation. The pilot membership ratified this agreement on May 3, 2006.

---

[1] The Pilot class is made up of pilots who are participants in the challenged pension plan, who are age 40 and over, and who either do not receive contributions under the MP3 or who receive contributions that are lesser than they would have received under the pro-rata to pay plan.

On April 26, 2006, the Master Executive Council (MEC), the member-elected representatives of ALPA at Northwest, unanimously resolved to adopt a target plan to distribute Northwest's retirement contributions. The MEC informed the membership and posted the news of its decision on its website on April 27, six days before voting on the agreement closed. Throughout 2006 and 2007, the MEC continued to consider the exact actuarial assumptions underlying the target plan and negotiated with Northwest for the adoption of the plan. On December 11, 2007, Northwest and ALPA implemented the MP3. Under the MP3, a "gross target benefit" is calculated for each pilot. Each pilot receives an amount based on the difference between the pilot's gross target benefit and his frozen pension plan benefit. A pilot whose frozen pension plan benefit exceeds his gross target benefit does not receive MP3 contributions; he receives only his frozen pension benefit. A pilot whose gross target benefit exceeds his frozen pension plan benefit will receive contributions under the MP3, but in some cases the contributions will be less than they would have been under the pro-rata to pay plan.

The MEC's resolution dated April 26 explained its decision: given the "limited resources available," and the fact that "continued funding of the frozen Pension Plan is an application of resources which provides greater benefits to longer-service pilots than to shorter-service pilots," resources should be used to create "to the maximum extent possible, parity of retirement expectations among all pilots." Without a target plan, ALPA predicted that the combination of the pro-rata to pay plan and the frozen Pension Plan would have resulted in a wide disparity in retirement benefits among active pilots ranging from 30% to 75% of their Final Average Earnings.

## II. DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed" must support the assertion by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Though the language of the Pilots' motion echoes their already-dismissed Age Discrimination in Employment Act claims, the DFR discrimination claim is reviewed under a different standard; that of the Railway Labor Act, 45 U.S.C. §§ 151-164 (2006). Under the Railway Labor Act, an exclusive bargaining agent is obligated to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). In general, the court's review of union decision-making must be highly deferential:

> Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.

*Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991); *see Thompson v. United Transp. Union*, 588 F.3d 568, 572 (8th Cir. 2009). Under this standard, "[d]iscriminatory conduct occurs when the union fails to serve 'the interests of all members without hostility or discrimination toward any.'" *Thompson*, 588 F.3d at 572 (citing *Vaca*, 386 U.S. at 177). To show discrimination, individuals must "adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of Street, Electric Ry. and Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971); *see also Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010). "There is no requirement that unions treat their members identically as long as their actions are related to legitimate union objectives." *Vaughn*, 604 F.3d at 712 (citing *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953); *Ryan v. N.Y. Newspaper Printing Pressmen's Union No. 2*, 590 F.2d 451, 457 (2d Cir. 1979)).

"[W]hether [a union] acted discriminatorily . . . depends on the subjective motivation of the union's officials." *Jeffreys v. Commc'ns Workers of Am.*, 354 F.3d 270, 275-76 (4th Cir. 2003). Thus, evidence that a union disadvantaged members of a group solely because of their membership in that group, together with evidence of animus, create a genuine issue of material fact as to whether the union was motivated by discrimination. *See, e.g.*, *Carter v. United Food and Commercial Workers*, 963 F.2d 1078, 1081-82 (8th Cir. 1995) (denying union's motion for summary judgment where meat wrappers, all of whom were woman, produced evidence that the union only perfunctorily advanced meat wrappers' interest and that union president and officials made "overtly discriminatory" statements about meat wrappers and their desire to rid the union of women). Without evidence of discrimination, however, merely distinguishing between two groups is not discriminatory. *Thompson*, 588 F.3d at 572.

The Second Circuit in *Vaughn* illustrates the necessity of showing animus or hostility on the part of the union in the context of a union's decision to adopt a pension plan. 604 F.3d at 712. The *Vaughn* plaintiffs, U.S. Airways pilots over or near the mandatory retirement age of 60, alleged that ALPA discriminated against them by agreeing to the terms of a target plan that "impacted older pilots more harshly than younger pilots." *Id.* The court of appeals affirmed the dismissal of the case for failure to state a claim, concluding that "[t]he fact that older pilots may have received fewer benefits under the plan is . . . 'the result of basic economics, specifically the time value of money, and is not related to the older pilots' age.'" *Id.* Without evidence of intentional discrimination, "the mere fact that older pilots were disproportionally affected is not sufficient to show" discrimination under the DFR. *Id.*

A.  **Evidence of a hostile atmosphere**

   1.  **Among members**

The Pilots first allege that evidence of a hostile atmosphere during the adoption of the MP3 is evidence that the union acted with animus. The Pilots have produced numerous emails from "junior" pilots to the MEC demonstrating tension and strife over the way Northwest stock was distributed and delays in the implementation of the MP3. Evidence of animosity between union members does not, by itself, translate to animus for the purposes of a DFR violation. Disputes over benefits are by their very nature intense; vigorous debate, complete with mudslinging, is to be expected. Indeed, this is why courts require evidence of a union's improper motivation. *See Smith v. Hussman Refrigerator Co.*, 619 F.2d 1229, 1238 n.9 (8th Cir. 1980) ("[T]o preclude imposing liability on a union because of mere differences of opinion . . . this court has frequently stressed the importance of improper motivation."). Moreover, all of the emails cited by the Pilots were sent *after* the MEC had stopped evaluating other options for

6

allocating Northwest's contributions and had settled on a target plan. The MEC unanimously resolved to adopt a target plan in April 2006, several months before any of the cited emails were sent. To the extent the resolution to adopt a target plan was not a final decision, the Pilots agree that the MEC settled on a target methodology, to the exclusion of any others, when Northwest's contribution levels to the plan were negotiated. (Defs.' Br. 6) The record shows that Northwest's contributions were set no later than July 31, 2006—also before any of the emails on which the Pilots rely.[2] While the MEC was still evaluating actuarial assumptions underpinning the target plan, and negotiating with Northwest for the adoption of the target plan, the basic proposition that the target plan would be used "to mitigate the gap (harm) caused to mid-career and short-service pilots under a 'flat rate' scenario" was clear by August 4, 2005. (Wasow Decl. Ex. 34) These emails, regardless of their fervor, would not have affected the MEC's decision-making.

### 2. Statements by the MEC

The Pilots next offer statements by the MEC as evidence of animus. For example, the Pilots offer the MEC's responses to the emails sent by frustrated junior pilots, discussed above. The responses include statements such as, "Your points are well taken and I can say I understand your points of view, possibly because I am there with you"; and "I understand your frustration . . . . Know that you've got the entire MEC behind you." The Pilots also point to statements that MEC member George Gurke allegedly made to Senior Pilot Michael Tanksley.[3] When running

---

[2] The tentative agreement of March 3, 2006, included an "interim" contribution from Northwest of 5%. The MEC resolution that adopted a target methodology in April 2006 referred to 5-8% contributions. A letter agreement made on July 31, 2006, stated Northwest's contributions officially as 5-8%.

[3] Tanksley reports these conversations in a declaration to the Court. ALPA asked the Court not to consider the declaration because Tanksley did not previously identify these

for Local Executive Council in 2007, Gurke allegedly told Tanksley that, if elected, he would only represent pilots "who were in his position." Tanksley infers that Gurke meant a "relatively junior" position. In 2009, Gurke allegedly responded to a "direct reference to targeting" by saying that the policies behind the target plan were justified because senior pilots "had it coming to them." The Pilots also offer a 2007 newsletter from then-Chairman of the MEC, Dave Stevens. Stevens refers to a "war of words" between pilots and discusses the need for unity within the union. Stevens's letter urges members of the union to "either take the path to a new life by leaving NWA altogether or take the path to re-engagement with ALPA in order to repair our contract." The Pilots argue, without support, that this letter was asking those who did not support the target plan to leave the union.

These statements, without more, would not allow a reasonable juror to determine that Miller, Gurke, Stevens, or the MEC itself adopted the target plan out of animus. The belief that a target plan was necessary to level the field between longer-working pilots with larger pensions locked in by the frozen pension plan and junior pilots who lacked that security is not unreasonable or hostile. Even if MEC members expressed support for junior pilots as a group, such support does not indicate hostility toward another group or support the inference that the MEC adopted a target plan out of discriminatory hostility. *See Spellacy v. Air Line Pilots Ass'n Int'l*, 156 F.3d 120, 129-30 (2d Cir. 1998); *Griffin v. Air Line Pilots Ass'n Int'l*, 32 F.3d 1079, 1084 (7th Cir. 1994) ("[T]he fact that discovery in this case has uncovered alleged statements by highly-placed union officials expressing distaste for pilots who did not join the union should surprise nobody. Likely in any union the true believers resent the lukewarm. This sentiment

---

conversations in his answer to his interrogatory or deposition when asked to identify "any communications with" the MEC. Because consideration of the declaration does not alter the Court's judgment on the issue of summary judgment, ALPA's request will not be addressed.

8

cannot support the inference that the union leaders targeted the pilots who were not union members.").

The Pilots cite several cases, including *Carter*, for the proposition that courts will consider an atmosphere of antagonism when evaluating a DFR breach. *Carter* is distinguishable because there was evidence of "overtly discriminatory remarks" by the union president and other union leaders who had expressed a desire to "get rid" of women in the union. 963 F.2d at 1081. Likewise, in *Alvey v. General Electric Co*., 622 F.2d 1279, 1290 (7th Cir. 1980), the court of appeals concluded only that the jury "should have been allowed to consider" evidence of an "emotional meeting" and "underlying antagonism" between the two groups. *Id. Alvey* does not stand for the proposition that emotions, heated words, or "underlying antagonism" between two groups is, alone, enough to create an issue of fact with respect to whether union leadership acted with discrimination. *Id.* The other cases identified by the Pilots consider evidence of antagonism or hostility within the union, but none support the notion that animosity between groups within the union, even if known by leadership, can by itself create an issue of fact as to a union's breach of the DFR. *See, e.g.*, *Ramey v. Int'l Ass'n of Machinists and Aerospace Workers*, 378 F.3d 269, 284 (2d Cir. 2004); *Butler v. Local Union 823, Int'l Bhd. of Teamsters*, 514 F.2d 442, 452-54 (8th Cir. 1975), *overruled on other grounds by United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 60 (1981).

**B.     Pretext**

Next, the Pilots argue that the MEC's stated reason for adopting a target plan—parity of retirement expectations—was pretextual and thus there is a question of fact about its motivation for adopting the plan. In support, the Pilots point to evidence that the target plan did not achieve its goals. For example, an August 2007 email from MEC Communications Chairman Monty

Montgomery says "we are strongly targeting some pilots that will end up with nearly 60% [Final Average Earnings] and barely targeting others that end up with well under 50%." They also offer a declaration by actuarial expert Ian Altman for the proposition that, under the target plan, older pilots receive substantially less than younger pilots even when both groups have the same years of service and rate of pay.[4] This evidence shows only that the MP3 did not create complete equality between active pilots. Without evidence of hostile motivation, inequality is not enough to support a DFR claim. *Vaughn*, 604 F.3d at 712. Given the bankruptcy and Northwest's reduction in pension contributions, "it was inevitable that the resulting negotiations would affect some pilots more harshly than others." *Id.*

The Pilots also argue that the MEC's decision to adopt a target plan in spite of the Retirement and Insurance Committee's initial recommendation of a pro-rata to pay plan indicates animus. As of August 4, 2005, before the pension plan had been frozen, the Committee recommended a pro-rata to pay plan because it allowed "consistent treatment of all plan participants." (Wasow Decl. Ex. 34) The record reveals, however, that the Retirement and Insurance Committee met multiple times, and prepared reports on the pros and cons of both plan types. The fact that it initially recommended a pro-rata plan but ultimately endorsed a target plan does not, without more, suggest animus. *Cf. Thompson*, 588 F.3d at 573-74. Indeed, the latest endorsement of a pro-rata plan identified by the Pilots was made in August 2005. (*Id.*) At that point, the pension plan was not yet frozen and Northwest's contributions under the new plan were not yet known; both events that influenced ALPA's decision to endorse a target plan.

---

[4] ALPA objects to the Court's consideration of Altman's declaration because it does not meet the standards for admission of expert testimony. Consideration of the disputed document does not alter the Court's judgment on the issue of summary judgment. Thus, the Court declines to address ALPA's objection to the admissibility of the document.

There is not evidence that ALPA accepted one plan while "spurning any consideration" of an alternative. *Cf. Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 611-13 (1st Cir. 1987).

The Pilots next argue that the MEC's failure to adjust the MP3 following the change in mandatory retirement age and after Northwest's merger with Delta shows that the MEC was "not willing to pursue any analysis that might yield the 'wrong' results, i.e., finding out that targeting did not meet its purported goal." (Defs.' Br. 34) After the MEC officially adopted the MP3, Congress extended the mandatory retirement age for pilots from 60 to 65. 49 U.S.C.A. § 44729(a) (West Supp. 2010), and Northwest merged with Delta. The Pilots offer the opinions of the MEC's actuarial advisors, given during the initial consideration of a target plan, that the two events would be cause to reevaluate the assumptions underpinning the accuracy of the MP3. They also offer Altman's opinions that "reflecting the changes that occurred after the target amounts were set would have raised class member benefits" and that calculations reflecting the change "should have been done." The Pilots do not, however, explain how a failure to analyze the effect of new factors amounts to animus based on age. ALPA's decision not to reassess the MP3 in the wake of these changes, without evidence that the decision was made for an invidious purpose, could not allow a reasonable jury to determine that adopting the plan was motivated by animus toward senior pilots.

C.    **Evidence that the MEC misled union members**

The Pilots also argue there is evidence of animus because ALPA misled the pilot membership about the effect of the target plan. The Pilots argue that the MEC deceived pilots by "(1) failing to correct the perception that they would get some amount under targeting, even when the MEC knew they would not, and (2) passing the targeting resolution at the eleventh hour of the TA ratification period." (Defs.' Br. 36) In support, they offer an email dated

11

December 2, 2007, from MEC member A. Ray Miller. Miller states that "communications were LESS than completely honest during the TA ratification" and that "it was NEVER stated that over 2000 pilots would get very little or NO contribution after targeting." They also cite an email from one pilot explaining his belief that the target plan was "never diligently explained" and a declaration from another pilot stating he "didn't realize that over 2,000 pilots would be getting zero" and that he felt "senior pilots had been duped by a backroom deal."

Notwithstanding the Pilots' assertions, there is evidence in the record that the MEC clearly disclosed the impact of a target plan. In a Council 1 Update sent to pilots on April 20, 2006, the MEC explained that, if a target methodology were adopted, "a pilot whose DB benefit is already projected to be 50% [Final Average Earnings], could receive a nominal (or zero) [defined contribution]." Nevertheless, if the impact of the target plan was neither well explained nor well understood, this alone does not raise a genuine issue of material fact about the union's discriminatory motivation. The Pilots' reliance on *Mansfield v. Air Line Pilots Ass'n Int'l*, No. 06 C 6869, 2009 WL 2386281, *3 (N.D. Ill. July 29, 2009), is unavailing. *Mansfield* also involved a DFR-based challenge to an MEC decision to adopt a pension plan in the wake of an airline's bankruptcy. *Mansfield*, however, dealt only generally with the DFR and did not specifically address evidence of discrimination. Further, in *Mansfield*, the plaintiffs came forward with evidence suggesting that the MEC "engaged in an elaborate show of soliciting expert advice and pilot opinion" when it had already decided to eliminate an option that would have placed all but two MEC members in a worse financial position. *Id.* In contrast, here, approximately half of the voting MEC members in 2006 and 2007 receive no contributions under the target plan and the Pilots have offered no evidence suggesting that the MEC deliberations were a sham. In the absence of such evidence, *Mansfield* clearly stated that "an allocation

12

method that favored one group of pilots over another is not by itself indicative of a breach of the duty of fair representation . . . . Indeed, given the finite amount of funds available to distribute to the pilots, such a result was inevitable." *Id.* (citations omitted).

The Pilots also argue that because the MP3 was not submitted for membership ratification, it must have been adopted for an improper purpose. "[F]ederal labor law does not require ratification of employer-union agreements" and "ratification is required only if the union's constitution or by-laws or the agreement itself so provides." *White v. White Rose Food*, 237 F.3d 174, 183 (2d Cir. 2001). It is undisputed that membership ratification was not required by union regulations. The MEC decided, in a non-unanimous vote, in April 2007 not to subject the MP3 to ratification.[5] The Pilots offer union member emails expressing the belief that the MP3 would fail if submitted to the membership, as well as the opinion of one MEC member that ratification should have been required. Along the same lines, they offer an opinion from the MEC's actuarial consultants that ratification of a target plan may be impossible to achieve. This evidence suggests only that pilots and members of the MEC suspected that the plan would not be popular; these are not facts that would allow a reasonable juror to find animus on the part of the MEC. The Pilots also allege that MEC members told union members that the target plan had been approved by the membership during the ratification of the restructuring agreement. In support, the Pilots cite depositions by MEC members, one of which stated that "a few" MEC members made that claim. The April 2007 decision not to submit the MP3 for member ratification was shared with ALPA membership in an "NWA MEC Hotline" newsletter,

---

[5] In their briefs, the Pilots state that the MEC originally told the pilot membership that the membership would be allowed to vote on whether to implement a target or a pro-rata to pay plan. The evidence the Pilots rely on for this proposition, however, is a draft newsletter. The final version of the letter that went out to members, provided to the Court by ALPA, did not include a promise that the membership would be given an opportunity to vote on the implementation of a target plan.

13

however, and the Pilots offer no evidence to suggest that the MEC was not forthcoming about its decision. Further, such statements, without more, do not indicate animus or hostility on the part of the MEC, especially because no vote was required and the statements had no impact on the adoption of the target plan. *Cf. Spellacy*, 156 F.3d at 129.

**D.    Evidence that the MEC stood to gain from implementing the MP3**

Finally, the Pilots argue that "powerful members of the MEC stood to gain from the implementation of targeting" and that these members may have pressured or influenced others in the MEC into supporting the target plan. (Defs.' Br. 38) The MEC had 12 voting members in 2006 and 11 in 2007. In both years, six members were scheduled to receive a contribution under the target plan. It is undisputed that the 2006 and 2007 MEC votes on to adopt a target plan, were unanimous and conducted on a one-person, one-vote basis; however, the Pilots present evidence that any voting member of the MEC could have demanded a "roll call vote" at any time. According to the Pilots, if a roll call vote is called, each member has a number of votes proportional to the number of pilots he represents. Thus, those members representing more pilots control a larger portion of the vote.

The Pilots point to the testimony of MEC member Drew Grimes who stated that, in 2007, "all that was needed was three of the big block voters to control the outcome" of an MEC vote. Presumably, the "big block" voters are representatives from Minneapolis and Detroit, who, according to Grimes, represents several hundred more pilots than the other representatives. In 2007, Minneapolis and Detroit each had two voting representatives; in each city, one representative would receive contributions under the target plan and the other would not. The Pilots also offer a declaration of pilot Christopher Engel in which Engel states that he "heard rumors of threats of a roll-call vote being used to get MEC members to support targeting." The

Pilots also offer the declaration of pilot Eric Danfelt. Danfelt alleges that around January 2007, then-MEC member Jeff Panioto told him that "the reason the Targeting formula under consideration had such low contributions for many pilots was that the MEC members who controlled the roll call vote controlled the union," and junior pilots were "in charge." Danfelt goes on to express his "understanding" that the first officer MEC members from Detroit and Minneapolis could control the outcome of the vote.[6]

Even assuming that these statements show that first officers on the MEC could have controlled the outcome of the vote, the Pilots have not presented evidence that would allow a reasonable juror to find the MEC adopted the target plan for a hostile or discriminatory purpose. The fact that one, or several, of the younger MEC members could have controlled the outcome of the vote, or even that they did so, does not create an issue of fact as to their subjective intent. *Mansfield*, cited again by the Pilots, involved evidence that the MEC had tried to mislead the union members by conducting "sham" research and analysis of various plans. *Mansfield* does not support the notion that political maneuvering, particularly of the kind available to all members of leadership, by union leadership creates a question of fact regarding discriminatory animus. ALPA had to determine a method for distributing Northwest's contributions to pilot retirement and the inadequacy of the contribution meant that any plan "would necessarily favor some workers over others. 'That it did so—in a manner which, on its face, seems reasonable and in conformity with controlling agreements—does not, by itself, show invidious discrimination of the kind prohibited by the duty of fair representation.'" *Jeffreys*, 354 F.3d at 276 (quoting

---

[6] ALPA argues that the Court should disregard the declarations of both Engel and Danfelt because they were not identified as witnesses with relevant information pursuant to initial Rule 26 disclosures. Because reliance on the disputed documents does not alter the Court's judgment on the issue of summary judgment, ALPA's request will not be addressed.

15

*Chaparro-Febus v. Int'l Longshoremen Ass'n, Local 1575*, 983 F.2d 325, 330-31 (1st Cir. 1992)).

The Pilots also offer an e-mail from MEC member Gregory Averill on August 4, 2007, and his deposition testimony about that email, to show that pilot reaction to the target plan "intimidated senior MEC members." (Defs.' Br. 38-39) Averill's e-mail focuses on the negotiation of "cost containment," which the Pilots identify as one of the last issues that had to be resolved before the target plan could be implemented. Averill says, "I almost think I need to turn this over to Joe, Bill [Bartels] et al." because "otherwise the conspiracy theories will never end. I will not risk the senior pilot taking the blame for targeting failing." He concludes, "[t]he Bartels clan wanted to get [cost containment] out on the hotline and Bill has fanned flames of set up/conspiracy. I don't think I have a choice." Explaining this email, Averill testified that Joe and Bill "were the ones who were going to get contributions . . . so it could be argued that we were in no hurry to get targeting implemented, where they were going to get contributions. They were going to be more anxious to complete the targeting process." Knowing this, he sought to avoid the appearance of a conspiracy by one demographic trying to undermine the target plan when, in fact, he supported the adoption of the plan. The timing of the email alone prevents any inference or question that it could have influenced the MEC's decision to adopt the target plan—August 4, 2007, is more than one year after the date by which both parties agree the MEC had determined to adopt the target plan. While the Pilots have come forward with ample evidence that the atmosphere at Northwest during this time period was tense, among both MEC and union members, they have failed to show evidence of animus on the part of the MEC.

Finally, the Pilots allege that there was "an effort to remove" Chairman Dave Stevens from the MEC which shows that "senior [MEC] members had no choice but to push the targeted

16

plan through or risk losing power." (Defs.' Br. 39)  The only evidence in the record of this "recall" is a 2007 email written by pilot Kelly Carman.  In it, Carman discusses pilot Drew Grimes and states that "[h]e loves Dave Stevens and doesn't know why we want to boot him." This email is not evidence that could cause a jury to find that the MEC acted with animus. Indeed, evidence that is "merely colorable, or is not significantly probative" cannot be the basis for a denial of summary judgment.  *Anderson*, 477 U.S. at 249-59.

### III. CONCLUSION

ALPA is not immunized from liability for breach of the DFR based on age discrimination simply because it reached a result which it could have reached if not motivated by animus; however, the Pilots have not proffered evidence that raises a genuine issue of material fact as to animus or hostility by ALPA or the MEC.  The record, viewed in the light most favorable to the Pilots, indicates only that the MEC made a decision, in strained economic times, that inevitably distinguished between two groups.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. ALPA's motion for summary judgment [Docket No. 289] is GRANTED.

2. Count I of Defendants' Amended Counterclaim [Docket No. 110] is DISMISSED WITH PREJUDICE.

    LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 21, 2010

s/ Joan N. Ericksen<br>
JOAN N. ERICKSEN<br>
United States District Judge